UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TONY B. GASKINS, et al.,                      C.A. 05-10630-JLT
                                              (LEAD CASE)
        Plaintiffs,

        v.

DAVID NOLAN, et al,

        Defendants.

MEMORANDUM OF LAW IN SUPPORT OF THE
DEFENDANTS' MOTION TO DISMISS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

The defendants submit this memorandum of law in support of
their motion to dismiss or, in the alternative, for summary
judgment.[1]

INTRODUCTION

The plaintiffs in C.A. 05-11230 are twelve state prisoners in
the custody of the Massachusetts Department of Correction ("DOC").[2]
The defendants named in the complaint are state officials employed
by the DOC.[3]

---

[1] The defendants' motion pertains to the complaint in C.A. 05-11230-JLT, which
action has been consolidated with the lead case indicated in the above caption.
This memorandum also addresses the issues raised in the plaintiffs' motion for a
temporary restraining order/preliminary injunction in C.A. 05-11230-JLT (P#48).
In its Order of September 13, 2005, the Court denied the plaintiffs' motion
without prejudice and ordered that it be considered in conjunction with a similar
motion pending in the lead case.

[2] Two of the original plaintiffs, Robert Brown and Joseph Irizarry, were
dismissed from the case pursuant to this Court's order entered on August 3, 2005.
(P#45)

[3] Kathleen Dennehy is the Commissioner of Correction; Tim Hall is an Assistant
Deputy Commissioner; David Nolan is the former superintendent of MCI-Cedar
Junction; Lisa Mitchell and John Luongo are deputy superintendents at MCI-Cedar
Junction; and Beverly Veglas is the librarian at MCI-Cedar Junction.

2

The plaintiffs filed a "Civil Complaint" (P#3) on June 6, 2005. At that time, eleven of the twelve plaintiffs were housed in the Department Disciplinary Unit ("DDU") at MCI-Cedar Junction. (Affidavit of Lisa Mitchell, ¶9)[4] They claimed that the defendants, through certain policies and procedures, were interfering with their access to the courts. They seek declaratory and injunctive relief, together with monetary damages under 42 U.S.C. § 1983.

For the reasons that follow, the complaint in C.A. 05-11230 should be dismissed because it fails to state a claim upon which relief can be granted. In the alternative, this Court should grant summary judgment in favor of the defendants.

<u>STATEMENT OF FACTS</u>

The plaintiffs allege that the "makeshift" library in the DDU does not have sufficient legal research materials. (Complaint, ¶¶21-23) According to the plaintiffs, they "will be lucky" to attend the library for four hours per month. (Complaint, ¶24) They have no "immediate access" to a photocopier, and they sometimes wait for days to receive their photocopied material. (Complaint, ¶¶23, 27)[5]

---

[4] Ms. Mitchell's affidavit is attached hereto. One plaintiff, Prince Moses, is housed in the general population. (Mitchell Affidavit, ¶9). Moses had been in the DDU but was released on January 28, 2004. <u>Id.</u>

[5] The plaintiffs cite an example where Tony Gaskins submitted a written request for copies on March 27, 2005 and received some, but apparently not all, of the photocopied material the very next day. (Complaint, ¶31)

3

The plaintiffs also complain about the procedure for visiting with their attorneys. An attorney who met with Tony Gaskins and Mac Hudson on March 26, 2005 was told that her visit would be "non-contact." (Complaint, ¶34) Gaskins met with the attorney behind a glass partition and spoke with her by phone. (Complaint, ¶35) The attorney had some legal documents for Gaskins and Hudson that she gave to the guards to pass to them. (Complaint, ¶36) Jeffrey Hardy claims that his attorney terminated her visit because it was non-contact. (Complaint, ¶37) Michael Keohane was allowed to have a contact visit with his attorney, but Keohane had to remain in "full restraints." (Complaint, ¶38) Keohane was unable to take notes or sign documents. (Complaint, ¶39)

The plaintiffs claim that they are entitled to call their attorneys at any time during normal business hours "if a matter of importance arises." (Complaint, ¶40) It can take days to receive special permission from the prison superintendent. (Complaint, ¶41) A DDU prisoner can earn up to four telephone calls per month, and if he has exhausted his phone privileges but still needs to call his attorney, the attorney must request permission from the superintendent. (Complaint, ¶42)

Finally, the plaintiffs assert that so-called "rubber" pens that are issued to DDU prisoners are inadequate. (Complaint, ¶45) All hard plastic pens were confiscated after an officer was stabbed in the eye with a pen. Id.[6] The plaintiffs claim that they cannot

---

[6] Ms. Mitchell explains that the "security flex pens" are made of flexible rubber

4

"effectively" write with the rubber pens, and that the policy was an "exaggerated response" to the stabbing of the officer. (Complaint, ¶¶45-46)

ARGUMENT

The Standard of Review

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must accept the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiffs. Rodi v. S. New Eng. Sch. Of Law, 389 F.3d 5, 9 (1st Cir. 2004); Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993). The court may dismiss the complaint only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

Summary judgment may be entered if the pleadings and other materials show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c). Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). In order to overcome a motion for summary judgment, the non-moving party must come forward with "specific, provable facts which establish that there is a triable issue."

---

tubing. (Mitchell Affidavit, ¶11) All hard plastic pens were confiscated from prisoners in the DDU, 9 Block and 10 Block under a policy that took effect on November 26, 2004. Id. Its purpose was to prevent inmates from stabbing correctional staff and each other with hard pens that could be fashioned into weapons. Id. One such incident occurred in the DDU on November 13, 2004 when an inmate assaulted two officers with a hard plastic pen that had been made into a weapon. Id. Both officers were seriously injured, and one officer lost vision in one of his eyes. Id.

5

Febus-Rodriguez v. Betancourt-Lebron, 14 F.3d 87, 91 (1st Cir. 1994). For a dispute to be "genuine," there must be sufficient evidence to permit a reasonable trier of fact to resolve the issue in favor of the non-moving party. *See* United States v. One Parcel of Real Property, 960 F.2d 200, 204 (1st Cir. 1992).

## 1. There Are No Claims Against Timothy Hall.

As an initial matter, it should be noted that Timothy Hall is not named in any of the six counts set forth in the pleadings. (Complaint, ¶¶ 48-53) He should be dismissed as a defendant on that basis alone.

## 2. The Claims For Declaratory And Injunctive Relief Are Moot.

None of the plaintiffs is currently confined in the DDU building. All prisoners were transferred out of the DDU on July 26, 2005. (Mitchell Affidavit, ¶7)[7] The DDU building is temporarily closed, and no inmates are housed there at the present time. (Mitchell Affidavit, ¶10)

---

[7] The inclusion of plaintiff Prince Moses in this case is perplexing. Moses was released from the DDU on January 28, 2004. (Mitchell Affidavit, ¶9) The basis for his complaint is not clear since Moses was last subject to the DDU rules well over one and one-half years ago.

6

To the extent that the plaintiffs seek preliminary and permanent injunctive relief with respect to the DDU library and the procedures for its use, their claim is moot. Toussaint v. McCarthy, 926 F.2d 800, 803 (9th Cir. 1990), cert. denied, 502 U.S. 874, 112 S.Ct. 213; Purvis v. Ponte, 929 F.2d 822, 824-825 (1st Cir. 1991) (complaint moot insofar as it sought equitable relief where inmate no longer resided at specified prison).

Moreover, under the Prison Litigation Reform Act ("PLRA"), 18 U.S.C. § 3626 (Supp. 1997), this Court may not grant prospective relief "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A) (emphasis added). See Inmates of Suffolk County Jail v. Rouse, 129 F.3d 649, 654 (1st Cir. 1997), cert. denied 118 S.Ct. 2366 (1998). As there is no allegation of a current or ongoing violation of the plaintiffs' rights with respect to the DDU library, the PLRA prohibits injunctive relief.

This Court should also decline to entertain the plaintiffs' request for declaratory relief. See DeNovellis v. Shalala, 124 F.3d 298, 313 (1st Cir. 1997) ("courts have broad discretion to decline to enter a declaratory judgment.") At present, there is no "actual controversy" with respect to the plaintiffs' use of the DDU library, and they lack standing to pursue their claim for a declaratory judgment. See Adult Video Ass'n v. U.S. Dep't of

7

<u>Justice</u>, 853 F.Supp. 263, 265 (W.D.Tenn. 1994), <u>aff'd</u>, 71 F.3d 563 (6th Cir. 1995)(discussing "case or controversy" requirement for Art. III standing and need for "actual controversy" under federal Declaratory Judgment Act, 28 U.S.C. § 2201).

### 3. The Defendants Are Not In Violation Of The Cepulonis Case.

The plaintiffs assert that the "makeshift" law library in the DDU violates <u>Cepulonis v. Fair</u>, 563 F.Supp. 659 (D. Mass. 1983), <u>aff'd in part</u>, 732 F.2d 1 (1st Cir. 1984). (Complaint, ¶¶ 22-23, 48-49) <u>Cepulonis</u> established a "satellite" library for prisoners confined in 10 Block at MCI-Cedar Junction. The ruling did not, on its face, apply to the DDU. The DDU was established in 1992. (Mitchell Affidavit, ¶5) It did not exist at the time of Judge Zobel's ruling in 1983.

The plaintiffs fail to specify precisely what part of the <u>Cepulonis</u> decision has been violated. Moreover, to the extent that the plaintiffs seek enforcement of the <u>Cepulonis</u> order, such relief is unavailable in an individual action under 42 U.S.C. § 1983. <u>Martel v. Fridovich</u>, 14 F.3d 1, 3 n.4 (1st Cir. 1993) ("The appropriate vehicle for enforcement of the consent decree is an action for contempt brought before the court responsible for the decree.")

### 4. The Plaintiffs Fail To State A Claim Regarding Access To The Courts.

The plaintiffs assert that the defendants are interfering with

their access to the courts. However, they have failed to demonstrate that they were prejudiced or suffered any injury from the alleged inadequate legal access. The plaintiffs must show an "actual injury" as an element of their claim. Lewis v. Casey, 116 S.Ct. 2174, 2180-82 (1996).

Seven plaintiffs filed "declarations" in support of their motion for a TRO/PI. (P#49) Of particular note is the Declaration of Tony Gaskins, dated June 23, 2005. In it, Gaskins states that each of the policies at issue in this case "has really hindered my ability to effectively litigate my pending civil and criminal cases." (Gaskins Declaration, ¶13) He lists eight pending cases, including the instant case. (Gaskins Declaration, ¶14) Gaskins candidly admits that "I haven't been hurt yet by (defendants') actions, but its just a matter of time before I will." (Gaskins Declaration, ¶15) Gaskins thus concedes that he has not been prejudiced by any of the policies instituted by the defendants.

The plaintiffs also fail to state a claim with respect to their allegations concerning the so-called "rubber" pens. (Complaint, ¶¶45-46, 53) Through their hand-written pleadings in this case, ostensibly written with the very pens they complain of, the plaintiffs have demonstrated that the pens are adequate for writing. The fact that they would prefer to write with hard plastic pens is immaterial. The right of access to the courts is "narrow in scope" and "does not extend to enabling prisoners to litigate with maximum effectiveness once in court." Boivin v. Black, 225 F.3d 36,

42 (1st Cir. 2000); <u>Puleio v. Commissioner of Correction</u>, 753 N.E.2d 814, 821 (Mass. App. Ct.), <u>rev. denied</u>, 759 N.E.2d 328 (Mass. 2001).

The plaintiffs are not entitled to access which is state-of-the-art. Access to the court need only be "adequate, effective, and meaningful." <u>Bounds v. Smith</u>, 430 U.S. 817, 822 (1977); <u>Blake v. Berman,</u> 625 F.Supp. 1523, 1525 (D. Mass. 1986). The constitutional standard is satisfied when an inmate has the ability "to prepare a petition or complaint," <u>Carter v. Fair</u>, 786 F.2d 433, 435 (1st Cir. 1986), and "to participate meaningfully in the legal process." <u>Sowell v. Vose</u>, 941 F.2d 32, 34 (1st Cir. 1991). To the extent that "ancillary features", such as writing supplies, "affect merely comfort or convenience" of access, the plaintiffs must show an "actual injury." <u>Id.</u> The court will not assume that a "less than optimal clerical arrangement actually impedes a prisoner's ability to file meaningful legal papers." <u>Id.</u>

It should be noted that the collective ability of the plaintiffs to litigate the instant case illustrates that they <u>do</u> have adequate access to the courts. They were able to prepare and file a neatly typed 16-page complaint in C.A. 05-11230-JLT (P#3), a motion for a TRO/PI (P#48), supported by a 9-page joint memorandum of law (P#49), and accompanied by numerous exhibits, declarations, and other papers. *See* <u>McDonald v. Hall,</u> 610 F.2d 16, 19 (1st Cir. 1979) (*pro se* inmate appeared to have adequate access to law library where his brief "clearly seems to be the product of more

10

than minimum competence.")

Moreover, the plaintiffs have access to typewriters at MCI-Cedar Junction. (Mitchell Affidavit, ¶12) This fact is undisputed, as evidenced by the typewritten complaint (P#3) and various other typewritten papers that the plaintiffs have submitted in this case. *See e.g.*, P#48 and P#49. This shows that they do not necessarily need to use the "rubber" pens to draft their pleadings.

## 5. There Is A Valid Security Reason For The Policy.

As explained by Ms. Mitchell in her affidavit, the "flex pens" were issued to prisoners in the DDU, 9 Block and 10 Block as a security measure. (Mitchell Affidavit, ¶11) The policy went into effect on November 26, 2004. <u>Id.</u> At that time, the DDU housed inmates who had been found guilty of committing the most serious disciplinary infractions while in DOC custody. (Mitchell Affidavit, ¶5) The Special Management Unit (SMU), composed of 9 Block and 10 Block, houses inmates who are awaiting hearings for serious disciplinary offenses, including charges that could result in a DDU sentence. (Mitchell Affidavit, ¶6) On July 26, 2005, the DDU was temporarily closed, and its inmates were relocated to other housing areas, including 9 Block and 10 Block. (Mitchell Affidavit, ¶7)

The "flex pen" policy aimed to prevent inmates from stabbing corrections staff and each other with hard plastic pens that could be fashioned into weapons. (Mitchell Affidavit, ¶11) As recently as November 13, 2004, a DDU inmate stabbed two corrections officers

with a pen that had been made into a weapon. Both officers were seriously injured, and one of them lost vision in an eye. <u>Id.</u>

This Court should defer to the defendants' judgment in this regard. The courts are generally deferential to prison authorities in their adoption and execution of practices that, in their judgment, are needed to preserve internal order and maintain institutional security. <u>Bell v. Wolfish</u>, 441 U.S. 520, 547 (1979). *See* <u>Cutter v. Wilkinson</u>, 125 S.Ct. 2113, 2124 n.13 (2005).

## 6. The Plaintiffs Are Afforded Reasonable Access To Counsel.

The plaintiffs claim that they have an unconditional right to make phone calls to their attorneys from the DDU. (Complaint, ¶40) Prison officials limit to four the number of phone calls that DDU inmates can make per month. (Complaint, ¶42) Telephone calls are considered a privilege, and an inmate may earn up to four telephone calls each month by remaining free of major disciplinary offenses. (Mitchell Affidavit, ¶16) An inmate may use his allotted telephone access to call anyone on his pre-approved telephone list, including his attorney. <u>Id.</u>

The plaintiffs assert a right to unrestricted attorney calls under several theories. *See* Plaintiffs' Joint Memorandum of Law (P#49) in support of their motion for a TRO/PI in C.A. 05-11230-JLT. They first point to a state regulation, 103 Code Mass. Regs. § 482. (Plaintiffs' Joint Memorandum, ¶3) There are two faults with this argument. One, the regulation specifies that inmates housed in

12

the DDU "shall have telephone privileges as authorized by the Superintendent." 103 Code Mass. Regs. § 482.09(5). Second, even if the defendants were violating this regulation, the enforcement mechanism is not a 42 U.S.C. § 1983 action in the federal court. An essential element of a § 1983 claim is an allegation that the defendants' conduct deprived the plaintiffs of a right, privilege or immunity secured by the Constitution or laws of the United States. Parratt v. Taylor, 451 U.S. 527, 535 (1981); Soto v. Flores, 103 F.3d 1056, 1061 (1st Cir. 1997). That is, the constitutional or statutory rights which are implicated in a § 1983 claim must be *federal* in nature. County of Sacramento v. Lewis, 118 S.Ct. 1708, 1714 n.5 (1998). A simple violation of state regulations, without more, does not comprise an actionable claim under 42 U.S.C. § 1983. *See* Sorenson v. Murphy, 874 F.Supp. 461, 463 (D. Mass. 1995) (not every failure of state agency to adhere to its self-imposed regulations results in a violation of the Due Process Clause); Johnson v. Summers, 577 N.E.2d 301, 304 (Mass. 1991) (the focus of a § 1983 action is whether defendant's conduct deprived plaintiff of a *federally* protected right, privilege, or immunity); accord, Smith v. Maloney, 735 F.Supp. 39, 42 (D. Mass. 1990) (reach of § 1983 does not extend to claim based solely on violation of state regulations).

The plaintiffs next theorize that their right to unrestricted phone calls stems from Mass. Gen. L. c. 272, § 99. (Plaintiffs' Joint Memorandum, ¶3) Again, § 1983 does not encompass asserted

13

violations of state statutes. <u>County of Sacramento v. Lewis</u>, 118 S.Ct. 1708, 1714 n.5 (1998). Even so, the statute cited by the plaintiffs does not address the situation here, i.e., whether prisoners may place unlimited phone calls to their attorneys.

Finally, the plaintiffs claim that their right to access the courts includes the ability to call their attorneys at any time. However, as stated before, a prisoner's ability to access the courts need not be state-of-the-art so long as it is "adequate, effective, and meaningful." <u>Bounds v. Smith</u>, 430 U.S. 817, 822 (1977). Here, the plaintiffs have means other than the telephone to confer with their attorneys. First, attorneys may visit their clients at MCI-Cedar Junction at any time between 9:00 a.m. and 8:30 p.m. any day of the week. (Mitchell Affidavit, ¶13) Attorney visits to DDU inmates are allowed without regard to that inmate's privilege status. <u>Id.</u> Furthermore, attorney visits are not limited in number or length of time. <u>Id.</u>

Second, the plaintiffs may correspond with their attorneys through the mail at any time. (Mitchell Affidavit, ¶15) This correspondence is treated as privileged, and an incoming letter from an attorney is only opened in the presence of the addressee inmate to ascertain whether it contains contraband. <u>Id.</u>

Finally, special arrangements will be made for an attorney to speak with his/her client in an emergency situation, as outlined by Ms. Mitchell. (Mitchell Affidavit, ¶ 17)

14

## 7. The Non-Contact Visiting Rule Is Reasonable.

The plaintiffs complain about non-contact visits with their attorneys in the DDU. (Complaint, ¶50) As Ms. Mitchell explains, attorney meetings with their clients at MCI-Cedar Junction are non-contact unless the Superintendent or his designee grants special permission for a contact visit. (Mitchell Affidavit, ¶14) One purpose of this rule is to protect the safety of the lawyers who are meeting with convicted felons inside a maximum-security prison. Id. The rule also works to prevent the introduction of contraband into the correctional facility. Id. As stated previously, the Court should defer to the judgment of prison officials in this regard, since the rule is reasonably related to the need to preserve order and institutional security. Bell, 441 U.S. at 547.

The plaintiffs claim that their "privileged communications" are compromised when they and their attorneys exchange documents by passing them through the correction officer on duty. (Complaint, ¶¶36, 50-51) However, they are not required to exchange documents in this way, and there is a ready alternative available to them. They may send papers to each other through the mail, and their correspondence is treated as privileged, i.e., incoming mail from an attorney is only opened in the presence of the addressee inmate to ascertain that its contents are free of contraband. (Mitchell Affidavit, ¶15)

15

## CONCLUSION

For the reasons stated herein, the complaint should be dismissed because it fails to state a claim upon which relief can be granted against the defendants. In the alternative, this Court should grant summary judgment in favor of the defendants.

Respectfully submitted,

NANCY ANKERS WHITE
Special Assistant Attorney General

Date: September 15, 2005        __/s/ David J. Rentsch_____
                                David J. Rentsch
                                Counsel, BBO #544926
                                Legal Division
                                Department of Correction
                                70 Franklin Street, Suite 600
                                Boston, MA  02110-1300
                                (617) 727-3300, ext. 142

## CERTIFICATE OF SERVICE

I, David J. Rentsch, certify that on this day I caused a copy of the foregoing paper to be mailed to each plaintiff, pro se, by first class mail, postage pre-paid, at his current address.

Date: September 15, 2005        __/s/ David J. Rentsch_____
                                David J. Rentsch

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

TONY B. GASKINS, et al.,                    C.A. 05-10630-JLT
                                            (LEAD CASE)
        Plaintiffs,

        v.

DAVID NOLAN, et al,

        Defendants.

<u>AFFIDAVIT OF LISA MITCHELL</u>

I, Lisa Mitchell, hereby depose and state as follows:

1. I am the Deputy Superintendent of Operations for Special Management Units at the Massachusetts Correctional Institution, Cedar Junction ("MCI-Cedar Junction") in Walpole, Massachusetts. I have held this position since August 2004.

2. The statements contained in this affidavit are either based upon my personal knowledge or upon my review of records that are kept and maintained in the official course of business at MCI-Cedar Junction.

3. MCI-Cedar Junction is a Level 6 (maximum security) correctional facility operated by the Massachusetts Department of Correction ("DOC").

4. I oversee the operation of the Department Disciplinary Unit ("DDU"), the Special Management Unit ("SMU"), and the Health Services Unit ("HSU") at MCI-Cedar Junction.

5. The DDU is located on the grounds of MCI-Cedar Junction in

2

its own building separate from the main prison facility. Established in 1992, the DDU is designed to house inmates who have been found guilty of committing the most serious disciplinary infractions while in DOC custody. Inmates may be sentenced to the DDU for a fixed period of time, up to ten years, as a punitive sanction for serious misconduct.

6. The SMU at MCI-Cedar Junction is located within the main facility in two different cellblocks. Those blocks are known as "9 Block" and "10 Block." Inmates who are housed in the SMU include those who are awaiting hearings for serious disciplinary offenses. Some of these inmates are charged with offenses that, if found guilty, could result in a sentence to the DDU.

7. On July 26, 2005, all inmates in the DDU were relocated to other housing areas. This was done as a security precaution following an incident in which a DDU cell door suddenly and inexplicably opened. The 106 inmates who were in the DDU were moved to four different areas: 9 Block (13 inmates), 10 Block (59 inmates), the HSU (1 inmate), and the SMU at the Souza-Baranowski Correctional Center (33 inmates). These inmates remain on DDU status and are serving their DDU sentences in their current housing assignments.

8. The twelve inmates who are plaintiffs in this case are currently housed in the following locations: Tony Gaskins,

3

Mac Hudson, Jeffrey Hardy, Steven Jacobbe, and Samuel Correa are in 10 Block; Carl Ordware is in 9 Block; Orrin Simmons, Derrick Tyler, Michael Keohane, Zakariya Ibrahim-Bush, and Trevor Higgins are in the SMU at the Souza-Baranowski Correctional Center; and Prince Moses is housed in the general population at MCI-Cedar Junction.

9. Eleven of the twelve plaintiffs are on DDU status at the present time. Prince Moses is the only plaintiff who is not on DDU status. He did serve a DDU sentence in the past, but he was released from the DDU on January 28, 2004.

10.    At the present time, there are no inmates physically housed in the DDU building. This will remain the case until any and all problems related to the cell doors are resolved.

11.    Inmates who were housed in the DDU and who are presently housed in 9 Block and 10 Block are not permitted to possess hard plastic writing pens. In place of hard pens, inmates may have "security flex pens." These pens are made of flexible rubber tubing. This policy took effect on November 26, 2004. It was instituted to prevent inmates from stabbing correctional staff and each other with hard pens. Inmates had been known to fashion their hard plastic pens into weapons. Such stabbings have happened in the past, and officers were seriously injured as a result. One such incident occurred in the DDU on November 13, 2004. In that

4

case, an inmate assaulted two officers with a hard plastic pen that he had altered into a weapon. Both officers were seriously injured, and one officer lost vision in one eye.

12.    Inmates at MCI-Cedar Junction have access to typewriters that are made available to them. Prior to the closure of the DDU, a typewriter was available for use in the legal research area of the DDU. Inmates in 10 Block may use the typewriter that is located in the satellite law library. As of September 9, 2005, inmates in 9 Block have access to a typewriter in the legal research area in that housing block.

13.    Attorneys may visit their clients at MCI-Cedar Junction pursuant to 103 CMR 486, Attorney Access at Massachusetts Correctional Institutions, at any time between 9:00 a.m. and 8:30 p.m. on any day of the week. While inmates on DDU status must earn social visits, attorney visits are allowed without regard to an inmate's privilege status. There are no limits to the number or length of time for visits by an attorney with his/her client.

14.    Attorney meetings with their clients at MCI-Cedar Junction are non-contact unless the Superintendent or his designee grants special permission for a contact visit. The purpose of having non-contact visits is to protect the

5

safety of the lawyers and to prevent the introduction of
contraband.

15.    Attorneys may correspond with their clients at any
time, pursuant to 103 CMR 481, Inmate Mail. Attorney-client
correspondence is considered privileged and is only opened
in the presence of the addressee inmate for the sole purpose
of ascertaining that its contents are free of contraband.

16.    Inmates on DDU status are awarded privileges based on
good behavior. Telephone calls are considered a privilege,
and an inmate may earn up to four telephone calls per month
by remaining free of major disciplinary offenses. An inmate
may use his allotted telephone access to call anyone on his
pre-approved telephone list, including his attorney.
Attorney phone calls are not monitored or recorded, per the
applicable policy. 103 CMR 482.08, Telephone Access and Use.

17.    If an attorney has an emergency for which he/she needs
immediate contact with a client on DDU status and, for some
valid reason, the attorney cannot visit the inmate at the
institution or correspond in a timely fashion, the attorney
may call the institution and make arrangements through the
Superintendent or his designee for a telephone call with the
inmate.


Signed under the pains and penalties of perjury this 14th

day of September 2005.

6

_____
Lisa Mitchell